[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Helene and John Gerardo, filed a complaint on August 31, 1998, alleging that the defendant, Robert Laraia, wrongfully retained their security deposit (count one), wrongfully demanded a security deposit in excess of one month's rent in violation of General Statutes § 47a-21(b)(2) (count two), violated the Connecticut Unfair Trade CT Page 436 Practices Act (CUTPA); General Statutes § 42-110 et seq. (count three), and intentionally inflicted emotional distress by intimidating the plaintiffs and refusing to return their security deposit (count four). The plaintiffs allege the following facts in their complaint. The plaintiffs entered into a contract to sell to the defendant property located at 125 Johnnycake Road in Burlington, Connecticut, with a closing date of February 17, 1998. The plaintiffs, who were older than sixty-two years of age, and the defendant agreed by written lease that the plaintiffs would remain in possession of the property as tenants for two months following the closing for rental of $3000 per month with a security deposit of $10,000. The plaintiffs vacated the premises in a timely fashion, but the defendant failed to return their security deposit. The plaintiffs seek damages, including double damages pursuant to Genera1 Statutes § 47a-21(d)(2) and punitive damages pursuant to General Statutes § 42-110(g); the plaintiffs also seek penalties pursuant to General Statutes § 47a-21(k)(1), attorney fees pursuant to General Statutes § 42-110(g) and any other legal or equitable relief.
The defendant filed an answer with a special defense and a counterclaim alleging civil theft (count one) and breach of a contract (count two). Count one of the counterclaim alleges that the plaintiffs failed to leave three dog collars, replacement flooring, components of curtain rod fixtures, blueprints, a skylight cover and a generator, all of which were the property of the defendant pursuant to the terms of the lease and the purchase and sale agreement. Count two alleges that the plaintiffs breached the rental agreement by converting fixtures to their own use and possession, and by commencing an action to recover the security deposit. The defendant seeks treble damages for civil theft pursuant to General Statutes § 52-564, exemplary damages, attorney fees and costs, and other legal or equitable relief.
 DISCUSSION I THE PLAINTIFFS' COMPLAINT A Security Deposit
The plaintiffs argue that the security deposit demanded of them exceeds the value of one month's rent, thus violating General Statutes §47a-21(b)(2). The plaintiffs further argue that the defendant failed to place their security deposit in an escrow account and commingled their CT Page 437 funds with his own personal account. See General Statutes §47a-21(h)(1). The plaintiffs argue that the defendant failed to return the plaintiffs' security deposit upon demand, and that the defendant owes double damages pursuant to General Statutes § 47a-21(d)(2).
The defendant argues, in accordance with his special defense, that the plaintiffs owe the defendant damages in excess of the amount of the security deposit. The defendant argues, furthermore, that the court may not consider claims concerning the failure to escrow because the plaintiffs made no allegations in their complaint concerning this purported statutory violation. The defendant argues as well that the defendant complied with the statutes governing security deposits.
The evidence showed that in November 1997, the plaintiff sellers and the defendant buyer entered into a purchase and sale agreement for the property at 125 Johnnycake Mountain Road, Burlington, Connecticut for $455,000.00. They agreed to a closing date of April 15, 1998. About a month later, the plaintiffs agreed to purchase property in Canton, Connecticut and had to close on that property in February 1998. The plaintiffs then requested the defendant to advance the April closing to February 17, 1998, and to allow them and their two adult sons to occupy the house until April 15, 1998 under a rental agreement. Over the next month, the parties' respective attorneys engaged in many negotiations surrounding the closing date and the lease terms. Initially, the defendant's security deposit demand was $20,000.00. The plaintiffs and their attorney negotiated the demand down; it was they who offered $10,000.00. The security deposit was held in the defendant's attorney's client fund and was released to the defendant after the plaintiffs vacated the house on April 15, 1998, and after the defendant determined the lease had been violated.
General Statutes § 47a-21(b)(2) provides that, "[i]n the case of a tenant sixty-two years of age or older, a landlord shall not demand a security deposit in excess of one month's periodic rent. . . . Upon the request of a tenant sixty-two years of age or older, any landlord who has received from such tenant a security deposit in an amount or value in excess of one month's periodic rent shall refund to such tenant the portion of such security deposit that exceeds one month's periodic rent." The remedy provided by this statute contemplates the return of the excessive portion of the security deposit to a tenant still occupying the premises. There is no remedy, pursuant to General Statutes §47a-21(b)(2), for the return of the excessive security deposit after the lease has terminated. Rather, to determine whether the plaintiffs are entitled to the security deposit or a portion thereof, the court must decide whether the defendant properly determined the damages he "suffered as a result of [the plaintiffs'] failure to comply with [their] CT Page 438 obligations. . . ." General Statutes § 47a-21(d)(1)(A). Because damages owed to the defendant pursuant to the lease agreement are in excess of the $10,000 security deposit; see section II, infra; the plaintiffs are not entitled to the refund of any portion of their security deposit.
The plaintiffs argue that the defendant failed to comply with General Statutes § 47a-21(h)(1), which provides that "[e]ach landlord shall immediately deposit the entire amount of all security deposits received by him . . . from his tenants into one or more escrow accounts for such tenants in a financial institution. . . ." Section 47a-21(k)(2) provides that "[a]ny person who knowingly and wilfully violates the provisions of subsection (h) of this section . . . shall be subject to a fine of not more than five hundred dollars or imprisonment of not more than thirty days or both for each offense. It shall be an affirmative defense under the provisions of this subdivision that at the time of the offense, such person leased residential real property to fewer than four tenants who paid a security deposit."
"The principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Citations omitted; internal quotation marks omitted.) Matthews v.F.M.C. Corp., 190 Conn. 700, 705, 462 A.2d 376 (1983). "What is in issue is determined by the pleadings and these must be in writing. . . . Once the pleadings have been filed, the evidence proffered must be relevant to the issues raised therein. . . . A judgment upon an issue not pleaded would not merely be erroneous, but it would be void." (Citations omitted; internal quotation marks omitted.) Wright v. Hutt,50 Conn. App. 439, 449-50, 718 A.2d 969 (1998).
Because the plaintiffs did not plead facts concerning the defendant's failure to escrow their security deposit, the court cannot render a judgment based on proof of any such facts. The plaintiff did request and was denied leave to amend the complaint during trial to add a claim pursuant General Statutes § 47a-21(h)(1). Had the amendment been allowed, the evidence is more than sufficient to show the defendant did not knowingly and willfully violate the provisions of Section 47a-21(h)(1). There was also evidence that the defendant has a good defense against the plaintiffs' escrow claim because he rented to less than four tenants paying security deposits. See General Statutes § 47a-21(k)(2).
Finally, under the circumstances, the $10,000.00 deposit was not simply a security deposit for the lease, but was consideration for the defendant's agreement, against the advice of his counsel, to change the closing date, to allow the plaintiffs and their adult sons and dogs to CT Page 439 occupy the property after the closing, and to bear the risks, including the risks of loss as set forth in the purchase and sale agreement.
Under the circumstances, the plaintiff cannot prevail on this count.
 B CUTPA
The plaintiffs argue that the defendant's violations of Connecticut statutes governing the retention of security deposits constitute per se violations of CUTPA. The defendant argues that the plaintiffs have failed to allege and prove an ascertainable loss, that the single transaction between the plaintiffs and the defendant cannot constitute a CUTPA violation, and that the defendant was not engaged in any business practices regulated by the statute.
CUTPA actions are applicable to disputes between landlords and tenants. Conaway v. Prestia, 191 Conn. 484, 493[, 464 A.2d 847] (1983). Failure to comply with the security deposit statute may amount to a violation of CUTPA permitting an award of punitive damages and attorney's fees. Murphy v. Grigas, Superior Court, judicial district of Hartford-New Britain, Housing Session at Hartford, Docket No. CVH-8903-31295W (December 4, 1992), Holzberg, J.). "Failure to return security deposit and denial of its existence, standing alone without further allegations, does not sufficiently allege violation of CUTPA." Chaspek ManufacturingCorp. v. Tandet, Superior Court, judicial district of Stamford-Norwalk, Housing Session at Norwalk, Docket No. 092714 (June 16, 1995, Tierney,J.).
As discussed above, the plaintiffs cannot prevail on their claims that they are entitled to recover damages for violations of the statutes governing security deposits. The parties entered into the two month lease as an adjunct to a purchase and sale agreement and at the request of the plaintiffs, not as part of a business practice of the defendant. There was no knowing violation of the statute and no showing of harm. That the amount of the security deposit technically exceeded the statutory limit will not alone establish a CUTPA violation.
 C Intentional Infliction of Emotional Distress
"In order for the plaintiff to prevail in a case for liability under . . . [the intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to CT Page 440 inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiffs distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Brackets in original; internal quotation marks omitted.) DeLaurentis v. New Haven, 220 Conn. 225,266-67, 597 A.2d 807 (1991).
The plaintiff Helene Gerardo testified at trial that she was distressed by the defendant's conflicts with the plaintiffs, stating, "I don't know I just don't think I'm more nervous than I was but I just — it's very unpleasant and I — I think about it a lot and that's a nuisance and it's — it's just upsetting." The testimony offered fails to establish that the defendant's conduct meets the four requirements of a claim for intentional infliction of emotional distress. See, e.g., Macciaroli v. Giannantoni, Superior Court, Judicial District of Bantam, Housing Session, Docket No. CV18-6775 (February 7, 2000, Gill, J.) (holding that four requirements for cause of action were not met where party alleged, but failed to prove violations of landlord-tenant statutes). The plaintiffs cannot recover for intentional infliction of emotional distress.
 II THE DEFENDANT'S COUNTERCLAIM
The defendant argues that the plaintiffs breached the lease agreement and committed civil theft by taking from the leased premises a skylight cover, electric dog collars, a generator, curtain hooks and boards of rosewood. The defendant argues that the skylight cover, the generator and the curtain hooks are fixtures that belong to him pursuant to the lease and the purchase and sale agreement. The defendant argues, furthermore, that paragraph twenty-two of the lease establishes that the dog collars and boards of rosewood, described in the lease as "replacement flooring in garage," are the property of the defendant.
The plaintiffs argue that the skylight cover, the generator and the curtain hooks are not fixtures, but are, rather, the plaintiffs' personal property. The plaintiffs argue that they never intended to leave the dog collars or rosewood flooring, and that the defendant's attorney added the relevant language to the lease at the last minute before the plaintiffs' attorney executed the lease in the plaintiffs' absence.
The defendant argues in response that the plaintiffs' attorney had actual and apparent authority to execute the lease agreement because the plaintiffs granted him general powers of attorney. The defendant argues, CT Page 441 therefore, that the plaintiffs are bound by the provisions of the lease.
"A power of attorney is an instrument in writing authorizing another to act as one's agent. The person holding a power of attorney is known as an attorney-in-fact thus distinguishing him from an attorney at law. . . . The rules governing the interpretation of written instruments generally govern the construction of powers of attorney. First and foremost the intention of the parties as it existed at the time the powers were granted is to be ascertained. Next, and when ascertained, that intention is to be given effect. The intention is to be ascertained from the writing alone, if possible." (Internal quotation marks omitted.)Consolidated Assn. of the Birches at Foxon, Inc. v. Gaetano, Superior Court, judicial district of New Haven, Housing Session, Docket No. SPNH-9508-44160 (January 4, 1996, Jones, J.) (16 Conn.L.Rptr. 191). "A written power of attorney constitutes a formal contract of agency and creates a principal-agent relationship. Long v. Schull, 184 Conn. 252,256, 439 A.2d 975 (1981). The principal in such a relationship is `bound by, and liable for, the acts which his agent does with or within the actual or apparent authority from the principal, and within the scope of the agent's employment. . . .' 3 Am.Jur.2d, Agency § 261." Bank ofMontreal v. Gallo, 3 Conn. App. 268, 273, 487 A.2d 1101, cert. denied,195 Conn. 803, 491 A.2d 1104 (1985); see also Rebillard v. Hagedorn,6 Conn. App. 355, 358 n. 2, 505 A.2d 731 (1986).
The written power of attorney forms signed by the plaintiffs authorized William T. Barrante to act m their place with respect to, inter alia, real estate transactions "for sale of 125 Johnnycake Mtn. Rd. Burlington, CT and for purchase of 44 Dry Bridge, Canton, CT including lease documents." By the very terms of each plaintiffs grant of written authority, Barrante had authority to execute the lease agreement on their behalf, the plaintiffs are, therefore, bound by the lease agreement.
 A Breach of Contract
Pursuant to paragraph twenty-two of the lease, the plaintiffs agreed that "all appliances, including but not limited to . . . electrical fence for dogs with collars . . . [and] replacement flooring in garage . . . are property of Landlord and remain with the premises." The plaintiffs also agreed to "cover the cost of professional cleaning of all rugs on the premises, which was to have taken place before the closing, but which was delayed and which is to be performed by Landlord at Tenants' sole expense upon vacating the Property. . . . If [Tenant] do[es] not break any terms of this Agreement [Landlord] will return [the $10,000] deposit within 30 days after the end of this Agreement. [Landlord] may apply as CT Page 442 much of the deposit as necessary to reimburse [Landlord] for any damages resulting from [Tenant's] occupancy. . . ."
In addition, the purchase and sale agreement provides that "[a]ll fixtures attached or appurtenant to or used in connection with said premises are represented to be owned by the Seller, free from all liens and encumbrances, except as set forth in the Contract and are included in this sale. Without limiting the generality of the foregoing, such fixtures include gas, lighting, other electrical, heating and plumbing fixtures, . . . [and] curtain rods. . . . All the above fixtures and personal property are sold in `AS IS' condition."
"A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) Tallmadge Bros., Inc. v. Iroquois Gas TransmissionSystem, L.P., 252 Conn. 479, 498, 746 A.2d 1277 (2000).
 1 "Fixtures"
The plaintiffs argue that the skylight cover, generator and curtain hooks are not fixtures pursuant to the terms of the purchase and sale agreement, and were not transferred to the defendant by the lease. The defendant argues that these items are, indeed, fixtures that were sold to the defendant at the time he closed on the property.
"To constitute a fixture, we must look at the character of how the personalty was attached to real estate, the nature and adaptation of the [personalty] to the uses and purposes to which they were appropriated at the time the annexation was made, and whether the annexer intended to make a permanent accession to the realty. The character of the personal property attached to the real estate is determined at the time that the property is attached to the real estate." Vallerie v. Town of Stonington,253 Conn. 371, 372 ___ A.2d ___ (2000). CT Page 443
A "fixture" is defined as follows by the American Heritage Dictionary: "1. Something securely fixed in place. 2. Something attached as a permanent appendage, apparatus, or appliance: plumbing fixtures. 3. Law. A chattel bound to realty. 4. A person or thing long associated with, established in, or restricted to a specified place, position or function. . . ." American Heritage Dictionary (New College Ed. 1982).
The defendant wrote a letter to the plaintiffs demanding the return of the skylight cover, which he contends was a fixture that the plaintiffs removed. Helene Gerardo told him during a visit that she would return the cover because it was accidentally packed up by the movers, but was intended to stay with the house. Helene Gerardo decided not to return it to him because "we became so nasty I decided that I was not going to give back the skylight cover or some other things that I felt I didn't have to."
Applying the test of Vallerie v. Stonington, the court concludes the skylight cover is a "fixture . . . used in connection with" the house. The skylight cover has a specific function and is "associated with . . . a specified place, position or function" in the house. American Heritage Dictionary (New College Ed. 1982). The unusually large skylight cover was custom made to fit and attach by way of toggles to the the skylight which takes up half of the roof. The plaintiff Helene Gerardo agreed that its function is served only when attached to the house. The purchase and sale agreement expresses the parties' intent to include the cover in the transfer of property.
The replacement value of the cover is $750.00.
The plaintiffs argue that the electric generator is not a fixture within the meaning of the purchase and sale agreement. In support of their argument, the plaintiffs submitted at trial a number of photographs of the generator. These photographs evidence that the generator attaches by normal electrical sockets and plugs, and that the generator is on wheels.
The generator is not a fixture to the premises. It is neither permanently attached, nor securely fixed in place, and it is not "established in, or restricted to a specified place, position or function." American Heritage Dictionary (New College Ed. 1982). The defendant may not recover the value of the generator.
Finally, the defendant argues that the plaintiffs took roller hooks that were part of the curtain rods specifically listed as the defendant's property by the purchase and sale agreement. Despite the defendant's CT Page 444 request that the plaintiffs return the hooks to him, they have not done so. The hooks are no longer available for purchase because the Swiss company that produced them went out of business. Without the hooks, the curtain rods which the plaintiffs were required to leave pursuant to the lease, cannot be used and must be replaced so that drapes can be hung to cover the numerous and large areas of window glass. The hooks are fixtures because they are an integral part of the curtain rods specified in the lease as fixtures to the house. The hooks are fixtures because they are "associated with . . . a specified . . . place, position or function." American Heritage Dictionary (New College Ed. 1982). The curtain rods are useless without the roller hooks. The cost of replacing the curtain rods is $896.76.
 2 Specific Items Listed by Lease
The lease provides that "replacement flooring in garage" is the property of the defendant. Although there is some dispute about the intent of the parties to include a pile of rosewood flooring versus some rosewood parquet tiles in a box in the garage, there is nothing in the lease itself that limits the "replacement flooring" to any particular type of flooring. "[T]o form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the exchange between two or more parties; see Restatement (Second), Contracts §§ 1(c), 15, 19 (Tent. Dr. 1964); 1 Williston, Contracts (1957) §§ 18, 22; see also Hoffman v. Fidelity Casualty Co., 125 Conn. 440, 444,6 A.2d 357 (1939); Clark v. Diefendorf, 109 Conn. 507, 510, 147 A. 33
(1929)." Ubysz v. DiPietro, 185 Conn. 47, 51, 440 A.2d 830 (1981). "The manifestation of assent may be made wholly or partly by written or spoken word or by other acts or by failure to act." (Internal quotation marks omitted.) Id. Thames River Recycling v. Gallo, 50 Conn. App. 767, 798,720 A.2d 242 (1998). See, Nutmeg State Machinery Corp. v. Shuford,129 Conn. 659, 661, 30 A.2d 911 (1943) ("making of a contract does not depend upon the secret intention of a party but upon the intention manifested by his words or acts, and on these the other party has a right to proceed"). "Meeting of the minds" is defined as "mutual agreement and assent of two parties to contract to substance and terms. It is an agreement reached by the parties to a contract and expressed therein, or as the equivalent of mutual assent or mutual obligation." Black's Law Dictionary (6th Ed. 1990). This definition refers to fundamental misunderstandings between the parties as to what are the essential elements or subjects of the contract. It refers to the terms of the contract, not to the power of one party to execute a contract as the agent of another. Sicaras v. City of Hartford, 44 Conn. App. 771, 784,692 A.2d 1290 (1997). CT Page 445
Before the sale of the house to the defendant, twenty to thirty bundles of wood which had been purchased for flooring were piled in the garage. In marketing the house for sale, the plaintiffs told a realtor that the pile of rosewood flooring was going to remain with the house. The plaintiffs also showed the pile of wood to the defendant as the replacement flooring that went along with the house. The plaintiffs did not show the defendant rosewood in the form of parquet tiles.
The lease negotiations were contentious as to what the plaintiffs wanted to keep. The language referring to replacement flooring and other items was included in the rental agreement because of concerns which arose when the plaintiffs indicated they would take the sub-zero refrigerator. The inclusion of the terms "replacement flooring in garage" and "electric fence for dogs with collars" was made after the plaintiffs' attorney had discussed the additions with them.
Although neither had seen the pile of wood, the parties' respective attorneys were clear with each other that they were referring to a large pile of wood that was used to make the flooring and that would be used to replace the flooring. There was no evidence that either attorney was aware of other wood such as some parquet tiles located in a box. There was a meeting of the minds between the defendant and the plaintiff's attorney in fact and a mutual assent that the pile of wood flooring was the property of the defendant and was to be left at the premises.
"To authorize a recovery of more than nominal damages, facts must exist and be shown by the evidence which affords a reasonable basis for measuring the [defendant's] loss. The [defendant has] the burden of proving the nature and extent of the loss. . . . Mathematical exactitude in the proof of damages is often impossible, but the [defendant] must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." (Citation omitted; internal quotation marks omitted.) Willow Springs Condominium Assn., Inc. v. Seventh BRTDevelopment Corp., 245 Conn. 1, 58-59, 717 A.2d 77 (1998). "Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . . [D]amages often are not susceptible of exact pecumary computation and must be left largely to the sound judgment of the trier. . . ." (Internal quotation marks omitted.) Lawson v. Whitey's Frame Shop, 241 Conn. 678,689, 697 A.2d 1137 (1997).
The plaintiffs originally purchased 850 board feet of Brazilian rosewood for flooring. The rosewood was stored on two four foot by four foot palettes in the garage. The rosewood was milled to form tiles and installed as parquet floors for two rooms of about 220 square feet. There CT Page 446 remained thirty bundles of rosewood of various lengths that made up the pile of replacement flooring in the garage. The length of the bundles was about nine inches by nine inches. Four or five bundles were left and twenty-five bundles were removed and given to a relative of the plaintiffs. The bundles reached a height of 22 inches. Based on those measurements, the plaintiff removed 310 board feet of replacement flooring.
The court has taken judicial notice of the existence of a federal statute establishing an embargo on Brazilian rosewood. Endangered Species Act, 16 U.S.C. § 1532 et. Seq.; 50 C.F.R. § 23.23. The replacement value of the rosewood, if a source could be found, is $80.00 per board foot. Accordingly, the defendant may recover damages of $24,800.00.
The defendant argues that the plaintiffs took dog collars that were his property pursuant to the provision in the lease that he was the owner of the "electrical fence for dogs with collars." The plaintiffs argue that "with collars" modifies the noun "dogs," thus describing the electrical fence and its function, and not transferring ownership of the collars. The defendant argues that the lease agreement establishes his ownership of the collars. The dog collars are property of the defendant pursuant to the terms of the lease. The fence and collars function together and constitute one item specifically listed as the defendant's property by the lease terms. To parse the language as the plaintiffs suggest would defy the plain meaning and logic of the lease's terms. If the court construed the contract as the plaintiffs suggest, the phrase "with collars" would not be necessary and would constitute meaningless excess language. Contrary to the plaintiffs' argument, a contract must be construed to give meaning to each term in the context of the entire agreement. See Linemaster Switch Corp. v. Aetna Life Casualty Corp., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 396432 (Jul. 31, 1995, Corradino, J.) (15 Conn.L.Rptr. 223, 231) ("[A] court must attempt to give meaning to every word of a contract, Downs v. National Casualty Co., 146 Conn. 490, 495[, 152 A.2d 3161 (1959).").
Although the defendant seeks damages for the removal by the plaintiffs of three dog collars, the more persuasive evidence is that the plaintiffs had only two dog collars and that the defendant is entitled to recover the replacement value in the amount of $500.00.
 3 Cleaning and Carpet Replacement Costs
CT Page 447
The defendant argues that he had to replace the carpets and have a cleaning service visit the premises because of damage to the property occurring during the lease term.
The plaintiffs had the carpets professionally cleaned before they surrendered the premises. The carpets were ten years old at the time. The plaintiffs' cleaner and son noticed no new stains on the carpets during the term of the lease. The evidence presented by the defendant fails to show that the condition of the carpet at the end of the lease term differed from its condition at the time of the closing on the sale of the property. Furthermore, although the lease required that the plaintiffs reimburse the defendant for carpet cleaning after their surrender of the premises, the defendant elected to replace the carpets rather than clean them. There are no costs for the plaintiffs to reimburse pursuant to the lease. As to the defendant's claims for his costs of house cleaning apart from the carpets, he has failed to show that the condition of the premises differed from its condition at the closing or that it showed damage beyond normal wear and tear. The defendant has failed to meet his burden as to his claim that the plaintiffs breached the provision of the lease providing that the plaintiffs would pay for "damages resulting from [their] occupancy" during the lease term.
The defendant cannot prevail on this claim.
 B Civil Theft
In Count One, the defendant seeks damages for common law conversion and treble damages for statutory theft for the loss of the rosewood replacement flooring, generator, skylight cover and dog collars. Connecticut's civil theft statute provides that "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages." General Statutes §52-564. "[C]lear and convincing proof of the actions alleged is required in order to assess treble damages pursuant to [General Statutes] §52-564." Lauder v. Peck, 11 Conn. App. 161, 163, 526 A.2d 539 (1987). "To `steal' commonly denotes `the commission of theft, that is the felonious taking and carrying away of the personal property of another, and without right and without leave or consent of owner, and with intent to keep or make use wrongfully.' Black's Law Dictionary (6th Edition)." Hirth v.Charbonneau, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 388888 (July 23, 1997, Lavine, J.). "The word `steals' as used in Section 52-564 is synonymous with the definition of larceny in the penal code, under General Statutes Section 53a-119. Lauderv. Peck, 11 Conn. App. 161, 165, 526 A.2d 539 (1987). Section 53a-119
CT Page 448 provides in pertinent part: `Larceny defined. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . .' General Statutes Section53a-119." Automatic Business Products Co. v. Hankinson, Superior Court, judicial district of Tolland at Rockville, Docket No. 47066 (May 20, 1992, McWeeny, J.) (7 C.S.C.R. 739, 740-41).
In Hirth v. Charbonneau, supra, Superior Court, Docket No. 388888, however, the court held that "there [was] no evidence that defendant intended to permanently deprive plaintiffs of the property when he removed it. The evidence, rather, [was] that defendant believed in good faith — albeit wrongly — that he could exercise a `landlord's lien' and that he removed and disposed of the property pursuant to this mistaken belief." Similarly, while it is a close question in light of the plaintiff Helene Gerardo's testimony that she would remove the dog collars and wood no matter what the contract said, I find the plaintiffs here lack the requisite intent as to the curtain hooks, skylight cover, rosewood and dog collars, which they believed, however incorrectly, were still their property. The evidence is inadequate to hold the plaintiffs liable under the first count of the counterclaim.
 III DAMAGES
The defendant is entitled to damages for replacement of the skylight cover, the curtain hooks, the rosewood and the dog collars. The defendant is entitled to attorney's fees pursuant to paragraph ten of the lease agreement, which provides that, upon the plaintiffs' default, the defendant is entitled to "actual damages, including reasonable legal fees and costs"
Replacement Skylight Cover $750.00
Replacement Rod and Curtain Hooks $896.76
Rosewood Flooring (estimated 310 board feet X $80) $24,800.00
Dog Collars $500.00
Attorney's Fees and Costs $14,179.42
SUBTOTAL $41,126.18
Credit for Security Deposit plus interest ($10,033.33) CT Page 449
TOTAL $31,092.85
Judgment may enter in favor of the defendant on all counts of the plaintiffs complaint.
Judgment may enter in favor of the plaintiff on Count One of the Counterclaim.
Judgment may enter in favor of the defendant on Count Two of the Counterclaim in the net amount of $31,092.85.
Tanzer, J.